STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
| --- | --- | --- |
| Appeal of Berezniak | } | Docket No. 171-9-03 Vtec |
| (Application of Wager) | } |  |
|  | } |  |

Decision and Order

Appellant David Berezniak appealed from a decision of the Development Review Board (DRB) of the City of Burlington, approving modifications to an existing building and the construction of a 27-unit apartment building on the same property, with associated site improvements, including driveways, parking areas, and landscaping. Appellant is represented by Norman Williams, Esq., who also represents nineteen other interested persons[1] who intervened in this matter; Appellee-Applicants John and Dena Wager are represented by Carl H. Lisman, Esq.; and the City is represented by Kimberlee J. Sturtevant, Esq. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who took a site visit alone by agreement of the parties. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda

---

[1] Documents filed by Appellant were also filed on behalf of the other interested persons.

and requests for findings filed by the parties, the Court finds and concludes as follows.

The project property, owned by Appellee-Applicant Dena Wager, is an irregular 1.2-acre (53,542-square-foot) parcel of relatively flat land with frontage on two streets: Archibald Street and Intervale Avenue, in the General Commercial (GC) mixed-use zoning district of the City of Burlington. Because the lot has frontage on two streets, it is considered to have two front yards and no rear yard, with the remainder of the lot lines defining side yards.

An existing building is located on the portion of the property with frontage on Archibald Street. The building, known as the Burgess Electric[2] building, was constructed in the 1970s and consists of a 11,300-square-foot concrete block building with a 980-square-foot shed attached to the rear (northeast) corner of the building, for a total building square footage of 12,280 square feet. The shed is used for the storage of lengths of PVC pipe and other electrical conduit material.

The building houses a wholesale electrical supply business that supplies materials to contractors and does a small amount of walk-in retail business as well. The business' operating hours are from 7:00 a.m. to 4:30 p.m. Contractors come to the property to pick up materials needed for their jobs; they also come in to order materials to be delivered by

---

[2] The business operated in the building is Green Mountain Electric Supply; however, the building is still commonly referred to as, and retains the sign for, Burgess Electric.

the business directly to job sites in the area. The business has five employees, including the manager, who work full-time on-site, and an outside sales person who comes to the building on a daily basis. Approximately three contractors per day are waiting at the site before the business opens at 7:00 a.m. to pick up materials prior to starting their work day; throughout the early morning hours, approximately three contractors' or other customers' vehicles are there at any given time, although each customer only spends less than ten minutes at the business. Between 8:00 a.m. and noon, no more than one or two customers' vehicles occupy the parking area at the business at any given time. The peak use hour for the parking areas by customers at the property tends to occur between 6:30 and 7:30 in the morning. Deliveries are made to the property daily at about 1:30 to 2:00 p.m. by a UPS truck. Other suppliers' delivery trucks are similar in size to the UPS van, except that PVC pipe is delivered approximately twice per year by a tractor-trailer.

As it now exists, the front of the building at Archibald Street is faced with brick, topped by a false mansard shingled roof edge. It presents a blank brick wall to the street, except for a glass door in the center of the wall, allowing walk-in access to the office or sales area for the business. The approximately 25-foot-wide area of the property between the front of the building and the street is paved and used for parking of one or two vehicles.

To the west of the building is a driveway lane wide enough for a tractor-trailer; the

driveway extends northerly across the property to exit at the Intervale Avenue curb cut. Between the driveway next to the building and the westerly property line is an additional paved area used for parking for approximately eleven vehicles. There is a door in the west side of the building, as well as two separate entrances at the rear of the building: a loading dock and an overhead door. A large additional paved area is available, though less convenient, for vehicle parking at the rear of the building, to the rear or north of the loading dock area.

As it now exists, the property is completely surrounded by a chain link fence, installed in 1993 after the property was cleaned up from years of unauthorized use and dumping, including the clearing of wooded areas on the site. At present, gates at both streets are locked after business hours.

The area is a mixed-use area, with single and multi-family residential uses, commercial uses, recreational uses, community uses and garage uses nearby. Across Archibald Street from the property is a multi-building, 20-unit affordable housing project known as Thelma Maple, with 35 spaces of off-street parking. Of the spaces available to the tenants and visitors at Thelma Maple, 17 units account for 20 tenants' cars. Moreover, the Thelma Maple parking area is used by unauthorized vehicles, especially in the winter during the on-street parking bans.

Along Intervale Avenue near the project are  2- or 2½-story houses, some in

single-family use and some in multiple unit rental use.  On both streets the buildings are located very close to the sidewalk.  Many, if not most, of the older houses in the area do not have sufficient off-street parking to accommodate the parking demand of their tenants and visitors.  During events at the nearby recreational facilities, and during the winter, it is difficult to find parking spaces on the street.  Appellee-Applicants' examination of the availability of on-street parking was conducted on only a few non-representative summer days and did not extend into the evening as would have been necessary to reflect the nearby recreational uses' parking demand.

Appellee-Applicants propose to build a 27-unit, affordable housing project, to be known as Roosevelt Apartments, at the Intervale Avenue end of the property, in an angled, three-story, flat-roofed building, designed so that the end of the building faces the Intervale Avenue frontage.  It would be higher than, and present a larger facade than the other nearby houses on Intervale Avenue.  Those houses generally have the gable end of a peaked roof or one side of a hipped roof facing the street, or, if flat-roofed, are not as tall. The building is attractive in design, with horizontal detail to reduce the visual scale of the building, and with an angled shape to reduce the potentially monolithic appearance of such a large building.  It is landscaped and includes a play area near the rear of the building.

The proposed Roosevelt Apartments building does not include any basement area or any underground or partially-underground parking.  Appellee-Applicants propose to

provide 21 off-street parking spaces to serve the building. They request a parking waiver and, in connection with the proposed waiver, propose that the tenants be authorized to use the eleven spaces at the Burgess Electric when the business is closed, that is, after 4:30 p.m. until just before 7:00 a.m. The waiver request in evidence as Exhibit 16 also proposed the lease of ten[3] spaces at the Burlington Housing Authority's Riverside project, on a dual use basis, that is, to be shared with a nearby health clinic.

Appellee-Applicants also propose to remove the chain link fencing and the gates on both street frontages of the property, to install a 980-square-foot addition on the front of the Burgess Electric building, with landscaping set into a jog in the front of the addition, a short pedestrian path to the front door, a mural occupying the area of a storefront window, and a remodeled roofline. They propose to remove the equivalent-sized shed from the back of the building, so that the total area of the building will be 12,280[4] square feet as before. Appellee-Applicants propose parking, walkways, and associated landscaping to

---

[3] Appellee-Applicants' memorandum, at footnote 5, refers to five spaces as being 'offered,' rather than ten. Section 10.1.13 of the Zoning Ordinance allows consideration of the availability and duration of off-site parking spaces up to 400' distant, but it must be documented in writing prior to the approval. No such documentation was in evidence; in addition, the distance of these potential spaces from the project was not provided to the Court.

[4] The project proposal in evidence as Exhibit 5 states (on page 2) that the total square footage of the Burgess Building will be 12,787, but that narrative appears to have predated the reduction in size of the proposed front addition to the building.

serve the two proposed uses.

They propose that the driveway be one-way onto the property from Archibald Street, past the loading dock area and to the parking lot for the housing project, so that all Burgess Electric business traffic would exit through the Intervale Avenue curb cut. They propose that the Intervale Avenue curb cut and the Roosevelt Apartments parking area serve two- way traffic. Appellee-Applicants do not propose to control the Archibald Street entrance or the lane from the loading dock area into the Roosevelt Apartments parking lot with a gate capable of being operated only by authorized tenants after hours, to prevent unauthorized parking use of the Burgess Electric parking spaces. Appellee-Applicants propose to incorporate into the proposal and to comply with the conditions imposed by the DRB in its approval, including the reduction of the width of the curb cut and traveled lane from Archibald Street.

Question 5 of the Statement of Questions

The question of whether the proposed project constitutes an alteration or enlargement of an existing non-conforming use depends on identifying the existing Burgess Electric building's compliance or non-compliance with any of the requirements in the Zoning Ordinance applicable to the proposal. We must then analyze whether the proposed project results in any new or greater non-compliance with any dimensional requirements or in a failure to meet parking requirements.

The existing Burgess Electric building appears to comply with all the dimensional requirements for the district. No front or side setbacks are required. The building and its existing paved areas appear easily to meet the 80% lot coverage requirement.

The question of what parking requirements apply to the existing Burgess Electric building use depends upon which use category is appropriate to describe the business. Both wholesale sales and wholesale distribution uses are conditional uses in the district. While these terms are not specifically defined in the ordinance, they can both be given meaning if the distinction between them is that a 'wholesale distribution' business delivers to retail outlets or contractors off the business premises, while a 'wholesale sales' business provides the purchased materials and supplies to the contractor at the business premises. This distinction also makes sense of the difference in parking requirements between the two categories in the Zoning Ordinance, as more customers will come to and need to park at a 'wholesale sales' business than a 'wholesale distribution facility.' Accordingly, parking requirements are set by the Zoning Ordinance at one space per 150 square feet of gross floor area for a 'wholesale sales' business, and one space per 500 square feet for a 'wholesale distribution facility.'

The Burgess Electric building use does not fall within the definition of the 'warehouse, retail' use category; that category applies to 'the sale of goods, either in bulk or as individual retail items, to the general public or to [members]," from a warehouse

type of facility, such as the examples of Costco or Sam's Club given by the City in its memorandum.  Nor does the Burgess Electric building use fall within the definition of a general 'warehouse' use category; that category applies to buildings used primarily for the storage of goods or materials, and although the category may include distribution, it does not include direct sales to contractors, as occurs on a daily basis at the Burgess Electric building.

It  is more difficult to determine what percentage of the Burgess Electric building use should be categorized as 'wholesale sales' as opposed to 'wholesale distribution,' as little evidence was presented from which the Court could make that determination. However, the result in this decision is the same regardless of the percentage used.  Even assuming that the entire facility should be categorized as 'wholesale distribution facility,' the existing use would require 25[5] off-street parking spaces as calculated under the Zoning Ordinance.

Under §10.1.4, an existing structure or land use is not subject to the parking requirements of Article 10 of the Zoning Ordinance, so long as the kind or extent of use is

---

[5]  Calculated as 12,280 square feet divided by 500 square feet per required space equals 24.56 spaces, rounded up to 25.  By comparison, if the business were calculated at 90% wholesale distribution facility and 10% wholesale sales, 30 spaces would be required;  and if the business were calculated at 75% wholesale distribution facility and 25% wholesale sales, 49 spaces would be required.

not changed; the section also requires that "any parking facilities now serving such structures shall not in the future be reduced below such requirements."

Appellee-Applicants appear to have assumed that the existing parking now serving the existing Burgess Electric building was the approximately eleven spaces to the west of the building which are to be striped and retained in the proposal. However, prior to the proposal the existing parking serving the Burgess Electric building also included the two spaces in the paved area in front of the building, plus the large expanse of paved or at least flat area in back of the building leading to the existing driveway exiting at Intervale Avenue. The existing area in the back available for parking is at least as large as the area on the side and the front, although it is not striped for parking spaces any more than is the area in front or to the west of the building. Because of the expanse of flat area behind the building available for Burgess Electric parking prior to the present proposal, the existing building is not nonconforming as to parking. That is, it has room for 25 off-street parking spaces, though they are not striped on the pavement.

As proposed, the project removes the two parking spaces in front and all the spaces in back, leaving only 11 spaces[6] to the west of the building and 1 inside the

_____

[6] Of these eleven spaces, four are sized for compact cars, which may be technically allowed, as eight compact spaces are allowed within the total of 32 spaces provided on site for the project as a whole, §10.1.15, but in any future proceedings before the DRB, the parties should

building, plus the loading spaces in the back.  Under §10.1.4 the 25 spaces serving the existing building cannot be reduced below that number without a parking waiver for the Burgess Electric parking, as well as the waiver for the new parking that would be required for the Roosevelt Apartments.  Accordingly, the application must be DENIED, without prejudice to Appellee-Applicants' application to the DRB for an additional parking waiver attributable[7] to the Burgess Electric required parking.

consider whether it is realistic to expect that building contractors would routinely collect supplies in a compact vehicle rather than in a full-size pickup truck or van.

[7]  Appellee-Applicants did not request such a waiver before the DRB and did not provide evidence of any study or count of the actual parking demand for the existing Burgess Electric use. The parking required for the proposed 27-unit apartment building, absent a waiver, would total 46 spaces.  (8 for the first 4 apartments plus 34.5 for the remaining 23 apartments, plus an additional 10% of those (an additional 3.45 spaces) for visitor parking, for a total of 45.95, rounded to 46).  The DRB treated the required parking for the whole project as 60 spaces, treating the parking required for the existing building as 14 spaces rather than the 25 as calculated here.

Appellant also argues that the total lot coverage of the project will become nonconforming, that is, it will exceed the 80% allowed in the Zoning Ordinance. The application narrative in Exhibit 5, at p. 3, described the lot coverage as 79%, and noted that the project qualifies for an inclusionary housing bonus of up to 92% lot coverage. The lot coverage of the revised application was not recalculated at trial; any further or revised application should address this issue as well.

Question 3 of the Statement of Questions

Aside from the issue of the parking attributable to Burgess Electric, we must determine whether the project meets the parking requirements of the Zoning Ordinance for the Roosevelt Apartments use.

As calculated in footnote 7 above, absent any waivers, 46 spaces would be required for the 27-unit apartment building. Appellee-Applicants request a waiver to supply only 21 spaces, based on an anticipated lower demand for parking for affordable housing units, together with the 4:30 p.m.-to-7:00 a.m. use of the Burgess Electric spaces, and the availability of public bus transportation nearby. On-street parking is not always available, and there is a high demand for it from other neighborhood uses, including rental housing with insufficient off-street parking and parking for events at the nearby recreational facilities. To avoid making the on-street parking problems in the

neighborhood any worse than they already are, it is important that this project have an adequate number of off-street spaces available to it.

Affordable housing units in the Burlington area require fewer parking spaces per unit than do market-rate housing units. However, based on the analysis of the census data for families in this census district with a household income even lower than the maximum eligibility income for this project, and an analysis of the Burlington Community Land Trust (BCLT) tenant and parking data adjusted for non-drivers, the appropriate measure of parking demand for the Roosevelt Apartments units is one vehicle per dwelling unit, not the 0.67 vehicle per unit suggested by the BCLT data. The BCLT data, even after being updated and corrected for some non-drivers, is derived from information obtained for the issuance of parking stickers for tenants, so that it does not necessarily reflect the total vehicle ownership of tenants who choose to park on the street rather than to apply for spaces. In addition, the BCLT data undercounted now-vacant apartments. Thus the minimum number of spaces that should be provided for this proposal is 27 spaces, unless other waiver criteria are also met.

Because the project proposal provides only 21 spaces for the this use, we must also analyze whether any other reduction in the required number of spaces can be based on the dual use of the Burgess Electric spaces, or on the availability and projected use of alternative transportation modes, that is, the public transportation bus system, or walking or

bicycling.  §10.1.19(a), (b) and (c).

As proposed in this application, the dual use of the Burgess Electric spaces cannot justify a reduction below the 27 spaces discussed above.  First, Burgess Electric would have its heaviest parking demand between about 6:45 and 7:45 in the morning, so it would be more essential for tenants to remove their cars promptly before 7:00 a.m. than it would be if the shared use were a 9-to-5 office building or a restaurant or movie theater or a retail use with later opening hours or later peak hours.  However, the most likely tenants to need these spaces would be those returning latest at night, after the 21 spaces proposed for the apartment building had been filled.  The likelihood that they actually would get up in time to remove their cars early enough to meet the needs of the Burgess Electric use, without some sort of public ticketing or towing enforcement of the shared use time frame, would be likely to depend on how late they returned, and on whether they were working a late night shift.  More importantly, unless both the Burgess Electric driveway intersection with Archibald Street <u>and</u> the entrance to the Roosevelt Apartments parking lot from the Burgess Electric driveway are equipped with gates that are closed at night and are operable by a card reader or key pad and only by authorized tenants, there will be no way to limit the nighttime use of the Burgess Electric spaces to those authorized tenants, even if they are willing to get up very early in the morning to remove their cars. Further, without a gate between the Burgess Electric parking area and the Roosevelt

Apartments parking area, drivers who entered the apartment lot at night and found it to be full would be likely to drive into the Burgess Electric lot the wrong way, to minimize the chance that a space in that lot would be gone by the time they went out of the Intervale Avenue exit of the apartment lot and around the block to the Archibald Street entrance to enter the Burgess Electric lot from the correct direction.  Late at night, the parking of such a 'wrong-way' car backing into an angled space would not be likely to pose a substantial safety problem, but it would create a safety conflict in the morning, as it would have to drive out the 'in only' driveway onto Archibald Street, conflicting with vehicles attempting to enter that driveway.

With regard to the 'alternative transportation modes' justification for a parking waiver, Appellee-Applicants presented evidence of the availability of bus service and the proximity of the downtown Burlington area for access by walking.  However, Appellee-Applicants did not meet the requirement of §10.1.19(c) to show the projected use by these tenants of either alternative transportation mode.  That is, the two bus routes serving this area are available to the tenants only from just before 7:00 in the morning to about 6:30 in the evening, Monday through Saturday, with a reduced schedule on Saturday.  On Sunday the area is served by a single bus circulating on a city-wide Sunday route.  If tenants had jobs on an evening or night shift that were outside walking distance, they would be more likely to need to keep a car.  Further, if the bus routes are convenient for

daytime commuting, a tenant with a car might be more likely to need a daytime parking space to leave a car in the lot, so as to commute to work by bus or by walking. With regard to walking, because this proposal is not in the immediate downtown area, the Court has insufficient evidence of how far the essential neighborhood services are and how far people are likely to walk to access them. Without such evidence of the projected use of these alternative transportation modes, no additional waiver below the 27 spaces can be based on the criterion in §10.1.19(c).

Question 4 of the Statement of Questions

This question asked whether the project's design is appropriate under Article 6 of the Zoning Ordinance, "including but not limited to whether the Project relates harmoniously to the scale and architecture of existing buildings and/or disrupts traditional neighborhood patterns." Appellant's post-hearing filings discuss the 'relates harmoniously' issue and also discuss whether the on-site vehicular and pedestrian circulation is adequate. Appellee-Applicant argues that Appellant failed to raise this latter issue in the Statement of Questions, so that it should not be considered by the Court. However, Question 4 allows the Court to consider on-site circulation under §6.1.10(d) as it is within Article 6 and was litigated at trial.

On-site circulation

The on-site circulation designed for the project reduces the Archibald Street (Burgess Electric) curb cut and driveway lane in width so that it would be clearly a one-way entrance-only driveway, connecting with and exiting through the Roosevelt Apartments parking lot through the two-way curb cut onto Intervale Avenue. With signage requiring those vehicles to stop at the entrance to the Roosevelt Apartments parking lot from the Burgess Electric driveway, and preventing vehicles from entering the Burgess Electric driveway in the wrong direction from the Roosevelt Apartments parking lot, such a vehicular path should be safe. The fact that vegetation in the corner of the neighboring property blocks visibility for vehicles passing from the Burgess Electric driveway into the Roosevelt Apartments parking lot would not be unsafe if the stop bar and stop sign were properly located just past that corner. With an appropriate condition requiring such a stop sign and stop bar, and 'wrong way' signage at that location facing the other direction, the proposed on-site circulation would meet §6.1.10(d).

Harmonious relationship

The alterations to the Burgess Electric building, and the design of its Archibald Street facade, meet the criterion of §6.1.10(a). Replacing the asphalt-and-chain-link front 'yard' and blank brick facade of the building with the proposed addition and landscaping will make it more compatible with the Archibald Street streetscape, as most of the other buildings in the area are located very close to the sidewalk. The proposed roof cornice

will be more compatible with the nearby nineteenth and early twentieth century buildings than was the false mansard shingled roof edge. The jog in the front of the building, landscaped with two small trees, will be more harmonious with the mixed residential and commercial neighborhood than was the large expanse of flat blank wall. The mural area will evoke the proportions of a storefront, even without an actual glass storefront window.

On other hand, although it demonstrates many good design features, the bulk of the proposed housing building at its Intervale Avenue frontage does not relate appropriately to its context and does not relate harmoniously to the scale of existing residential buildings in the vicinity along Intervale Avenue. §6.1.10(a). The placement of the building end on to Intervale Avenue, the angled shape of the building, the porches, and the horizontal cornice features at the roofline and the top of the ground floor story, are all good design features, but they do not counteract the effect of the bulk of the Intervale Avenue end of the building. To meet the requirements of §6.1.10(a), the Intervale Avenue end of the building would have to be reduced in height or bulk at least to the depth of the first set of apartments on that end of the building, so as to present to the street a more harmonious relationship and prevent the building from looming over the neighboring buildings. It is possible that a two-story or peaked or hip roof section or other redesign of the front segment of that end of the building could meet the standards of §6.1.10(a), but it is not the role of the Court to suggest any specific redesign parameters.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellee-Applicants' application is DENIED, for the reasons stated above, without prejudice to submittal of a revised application or revised designs for an affordable housing or other project on the same property as the Burgess Electric building.

Dated at Berlin, Vermont, this 7th day of July, 2005.

_____

Merideth Wright

Environmental Judge